```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------ X
JOHN BOSCO,                    :
                              :
             Plaintiff,       :
                              :
       -against-             :
                              :
UNITED STATES OF AMERICA,     :
                              :
             Defendant.       :
------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/26/2016

No. 14 Civ. 3525 (JFK)
**OPINION & ORDER**

<u>APPEARANCES</u>
FOR PLAINTIFF JOHN BOSCO
    Sherri L. Plotkin, Esq.
    Thomas P. Giuffra, Esq.
    RHEINGOLD, VALET, RHEINGOLD, McCARTNEY & GIUFFRA LLP

FOR DEFENDANT UNITED STATES OF AMERICA
    Preet Bharara, Esq.
    UNITED STATES ATTORNEY FOR
    THE SOUTHERN DISTRICT OF NEW YORK
    OF COUNSEL:  Elizabeth Tulis, Esq.

**JOHN F. KEENAN, United States District Judge:**

Defendant United States of America ("the Government") moves this Court to exclude certain evidence, to grant partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and to grant summary judgment pursuant to Federal Rule of Civil Procedure 56.  The Court denies in part and denies as moot in part the Government's motion.

Plaintiff John Bosco ("Bosco") sued the Government under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-80, after a routine surgical procedure performed at the James J. Peters Veterans' Affairs Medical Center ("Bronx VA")

allegedly caused Bosco to lose his spleen and his left kidney.
Bosco's complaint alleges three claims: (1) medical
malpractice; (2) lack of informed consent; and (3) negligent
hiring or supervision (referred to as "medical facility
negligence" in Bosco's complaint). In opposition to the
Government's motion, however, Bosco seeks to withdraw his claims
of lack of informed consent and negligent hiring or supervision.
The Court grants Bosco's de facto motion to amend his complaint
to withdraw these claims, which leaves just his medical
malpractice claim. In sum, the Government argues that it is
entitled to summary judgment on Bosco's medical malpractice
claim because the expert opinion of Dr. Joseph M. Ciccone ("Dr.
Ciccone") is inadmissible under Federal Rule of Evidence 702
and, without admissible expert opinion evidence, Bosco cannot
establish a prima facie claim of medical malpractice under New
York law. Bosco counters that Dr. Ciccone's opinion is
admissible and sufficient to support Bosco's claim of negligence
under res ipsa loquitur.

## I. Background

### A. Preoperative Treatment

On July 13, 2011, Bosco experienced blood in his urine
("hematuria") and went to the Castle Point Campus of the
Veterans' Affairs Hudson Valley Health Care System ("Castle

Point VA").[1]  A CT scan of Bosco's abdomen and pelvis performed at that time revealed a possible left renal midpole hemorrhagic mass and noted his liver and spleen to be normal in size.  Bosco scheduled a urology appointment for July 15, 2011, at Castle Point VA with Dr. Elliott Cohen, which Bosco attended continuing to complain of intermittent flank pain and hematuria.

On July 19, 2011, Bosco returned to Castle Point VA for a multivascular CT scan, which revealed one approximately 2.3 cm low density intraparenchymal lesion in the left kidney—likely a cyst—and clearance of the previously observed hemorrhagic mass. Bosco also underwent an ultrasound, which revealed right renal anechoic cysts and a left renal probable proteinaceous cyst. Bosco scheduled a urology appointment on July 22, 2011, at Bronx VA with Dr. Thomas Grimaldi ("Dr. Grimaldi").

Bosco attended his July 22, 2011 appointment with Dr. Grimaldi, who reviewed the prior scans and diagnosed Bosco's hematuria as originating from a cyst bleeding into his kidney's collecting system.  Dr. Grimaldi also observed some thickening

---

[1]  The Court's summary relies on the facts as presented in the parties' Local Rule 56.1 statements.  Bosco agrees with, but supplements, the Government's Local Rule 56.1 statement in all aspects save one:  Bosco "disagree[s] with [the] statement that 'with respect to the issue of preoperative consent, it is undisputed that Plaintiff was properly informed.'  However, because Plaintiff is withdrawing his claim for lack of informed consent, this issue is now moot." (See Pl.'s Loc. R. 56.1 Statement ¶ 5, ECF No. 54.)

of Bosco's kidney's collecting system itself.  Dr. Grimaldi recommended that Bosco undergo a cystoscopy and left ureteroscopy to rule out upper tract disease.  Bosco scheduled these procedures for August 8, 2011.

### B.  Surgery

On the day of the surgery, Bosco signed a consent form that described the risks and potential benefits of the cystoscopy and ureteroscopy, including "[i]njury or damage to nearby structures," the need for "additional treatment," "[b]ladder problems," and "[d]amage to the ureter[s], urethra, bladder or nearby organs."  By signing the consent form, Bosco attested that the procedure, its purposes, benefits, and risk had been explained to him and that he chose to have the procedures.  With Bosco generally anesthetized, Dr. Grimaldi performed the procedures between 8 a.m. and 9 a.m., assisted by Bronx VA residents Drs. Karl Coutinho ("Dr. Coutinho") and Boback Berookhim ("Dr. Berookhim").

The doctors began the procedures by advancing a cystoscope through Bosco's urethra.  Under fluoroscopic guidance, they then advanced a glide wire up the left ureteral orifice.  The doctors broke down the cystoscope and attempted to push a flexible ureteroscope over the glide wire at the ureteral orifice.  They experienced resistance and removed the ureteroscope.  The doctors then dilated the ureteral orifice with a ureteral access

sheath, advanced the ureteroscope up the glide wire, and removed the glide wire.  Afterwards, they performed a pyeloscopy, which showed the upper pole to be devoid of any tumors or masses, an opening consistent with a perforated parenchymal cyst at the midpole papilla without evidence of tumors, masses, or other stones, and some submucosal hemorrhage without evidence of tumor at the lower pole.  Next, the doctors performed a retrograde pyelogram that showed venous backflow.  The doctors removed the ureteroscope and moved Bosco to the recovery room in stable condition.  Later that day, Dr. Grimaldi concluded that the ureteroscopy revealed Bosco's hematuria was "likely caused by a lower pole cyst which ruptured into the collecting system."

### C.  Postoperative Treatment

After the surgery, Bosco complained of severe left flank pain radiating to the back and groin.  Bosco received no relief from painkillers Fentanyl, Toradol, Dilaudid, or morphine, so the doctors performed a second cystoscopy and placed a ureteral stent.  After this second surgery, Bosco returned to the recovery room in stable condition.

The next day, the Bronx VA discharged Bosco.  Two days later, Bosco's sister called Dr. Grimaldi because Bosco complained of considerable back and flank pain, a temperature of 99.7, frequent voiding, and only temporary pain relief from Dilaudid.  Dr. Grimaldi advised Bosco's sister that some of

Bosco's symptoms were consistent with stent-related discomfort, but instructed her to bring Bosco to the Castle Point VA if he developed a fever or the pain became severe.

Two days after that, on August 13, 2011, Bosco went to the Hudson Valley Hospital emergency room because he experienced consistent left flank pain, could not tolerate food or fluids for the last twenty-four hours, and had a low-grade fever.  The attending physician performed a CT scan that showed a large left perinephric hematoma and retroperitoneal hemorrhage (also referred to as a retroperitoneal bleed).  Hudson Valley Hospital transferred Bosco to the Bronx VA, where he was admitted to the intensive care unit.

In intensive care, Bosco received two units of packed red blood cells.  The Bronx VA doctors planned for a possible angiography and intervention if his bleeding continued.  Between August 13 and August 14, 2011, Bosco received a total of five units of packed red blood cells, but his hematocrit level continued to drop, which suggested that Bosco continued to bleed.  Dr. Grimaldi planned for a CT angiography with possible embolization.

On August 15, 2011, CT scans of Bosco's abdomen and pelvis showed a large perinephric dense hematoma in the region of the prior cystic lesion, stranding that tracked up around the left upper quadrant and spleen, and a suggestion of an

6

intraparenchymal area of subcapsular pathology, likely hematoma, versus extracapsular changes deforming the spleen.  In plain English, the scans showed Bosco's kidney bleeding had become more extensive and was not responding to conservative measures and blood transfusion.  An angiography failed to identify the source of Bosco's bleeding and the Bronx VA doctors decided to perform an exploratory laparotomy and left nephrectomy.  During surgery, the Bronx VA doctors evacuated intraperitoneal and retroperitoneal hematomas, identified Bosco's spleen and left kidney as the source of his bleeding, and removed both Bosco's spleen (noting it to be lacerated with massive hemorrhaging) and left kidney.  Bosco's postoperative diagnosis was splenic rupture and left perinephric hematoma.

On September 7, 2011, the Bronx VA transferred Bosco to the Montrose Campus of the Veterans' Affairs Hudson Valley Health Care System.  On September 15, 2011, Bosco was discharged.

## II.  Procedural History

### A.  Administrative Procedures

On or about June 11, 2013, Bosco filed an administrative claim with the Department of Veterans' Affairs, Claim No. 630A-4/02-4C. (See Compl. ¶ 2, ECF No. 1; Answer ¶ 2, ECF No. 7.)  On November 27, 2013, the Department of Veterans' Affairs Office of Regional Counsel denied Bosco's claim. (See Compl. ¶ 4; Answer ¶ 4.)

On May 16, 2014, Bosco filed the Complaint in this action. Bosco asserted three claims:  (1) medical malpractice; (2) lack of informed consent; and (3) "medical facility negligence," which is essentially a negligent hiring or negligent supervision claim.  The Government timely answered.

## B.  Expert Discovery

On June 3, 2015, Bosco disclosed the opinion of Joseph M. Ciccone, M.D., a urological surgeon, clinical instructor of surgery at Harvard Medical School, diplomate of the American Board of Urology, and fellow of the American College of Surgeons.  Dr. Ciccone practices general urology "with a high volume of ureteroscopic procedures." (Decl. of Sherri L. Plotkin Ex. F, at 1, ECF No. 52-6 [hereinafter Plotkin Decl.].)[2]

---

[2]  Bosco previously disclosed the opinion of Barry L. Singer, M.D., on December 10, 2014, and the Government deposed Dr. Singer on May 11, 2015.  In his opposition to the Government's motion, Bosco seeks to "withdraw[] from consideration the use of his expert Dr. Barry Singer." (Pl.'s Mem. in Opp'n to the Government's Mot. to Exclude Certain Evidence, for Partial J. on the Pleadings & for Summ. J. 2 (filed Dec. 18, 2015), ECF No. 53 [hereinafter Opp'n].)  The Government does not oppose Bosco's decision. (See generally Reply Mem. in Further Support of the Government's Mot. to Exclude Certain Evidence, for Partial J. on the Pleadings & for Summ. J. (filed Dec. 18, 2015), ECF No. 55 [hereinafter Reply].)  In light of Bosco's statement, the Court will not consider the admissibility of Dr. Singer's opinion. See In re Puda Coal Secs. Inc. Litig., 30 F. Supp. 3d 230, 256 (S.D.N.Y. 2014) ("[T]he Court views plaintiffs' decision to withdraw its [sic] primary accounting expert as a tactical decision, and one that plaintiffs are no doubt entitled to make.").

Regarding Bosco's lack of informed consent claim, Dr. Ciccone opines that the Government correctly informed Bosco. (Id. at 1.)

Regarding Bosco's medical malpractice claim, Dr. Ciccone opines that "traumatic injury to an organ outside of the urinary tract is not an accepted risk of the procedure and, in [his] experience, would be quite rare, let alone an injury severe enough to require both nephrectomy and splenectomy." (Id.; accord id. at 3 ("[T]he problems experienced by Mr. Bosco are highly unusual and not an accepted risk of diagnostic ureteroscopy. In other words, the need for splenectomy and nephrectomy do not typically occur in the absence of negligence.").) Dr. Ciccone concedes that he cannot "mak[e] a more precise determination as to what may have occurred" due to "the pristine nature of the operative documentation." (Id. at 3.) But still he offers "a number of possibilities" for Bosco's injuries. (Id.) These possibilities cluster around two causes: (1) too much pressure in Bosco's renal pelvis or (2) "some other form of undocumented or unappreciated surgical maneuver or error." (Id. at 2-3.)

Dr. Ciccone identifies three scenarios that could have created excess pressure in Bosco's renal pelvis based on the record. The first scenario could have occurred while irrigating Bosco's renal pelvis in order to visualize it better. While

performing the renal pelvis irrigation, Dr. Ciccone opines that the Government could have irrigated too much.  Dr. Ciccone points to the finding of venous backflow on Bosco's retrograde pyelogram in support of this scenario. (Id. at 2.)  According to Dr. Ciccone, "pyelovenous backflow is commonly seen," but, in his experience, "it generally results from extended or prolonged periods of high flow irrigation such as would be seen with challenging or prolonged nephroscopy procedures." (Id.)  Because the operative report provides no indication of complications,[3] Dr. Ciccone implies that Bosco's pyelovenous backflow originated from another source:  "improper monitoring of the assistant by the surgeon, particularly when an inexperienced assistant is present, could lead to higher-than-ideal renal pelvis pressures." (Id.)  Ultimately, however, "without a record of the amount of irrigation used, [Dr. Ciccone is] unable to determine if excessive pressure was created in the renal pelvis." (Id.)

Dr. Ciccone's second and third overpressurization scenarios originate from what Dr. Ciccone identifies as the Government's deviation from the accepted standard of care:  its failure to place an ureteral stent during Bosco's initial ureteroscopy.

---

[3]  Although Dr. Ciccone states that he "do[es] not have documentation as to the length of this procedure," (Plotkin Decl. Ex. F, at 2), he characterizes the procedure as lasting approximately 45 minutes in an affidavit submitted in opposition to the Government's motion, (see id. Ex. K ¶ 9, ECF No. 52-11). The parties do not dispute this fact.

(Id.)  In the second scenario, the Government's failure to place
the ureteral stent created excess pressure in Bosco's renal
pelvis that ruptured the cyst and caused his injuries. (Id. at
3.)  In the third scenario, Bosco's cyst ruptured during his
initial ureteroscopy before the ureteral stent should have been
placed.  But the Government's subsequent failure to place the
stent caused the Government to misdiagnose the cyst rupture as
renal colic, which delayed the correct diagnosis and delayed
"immediate admission for bedrest, which might have led to
resolution of the bleed without need for further surgery." (Id.
at 3-4.)  Even so, Dr. Ciccone "cannot say with certainty
whether this delay in diagnosis ultimately led to a worse
outcome for Mr. Bosco." (Id. at 3.)

Dr. Ciccone also identifies two scenarios related to
possible "undocumented . . . error."  Each scenario originates
from the Government's "unusual" and "unnecessarily challenging
and therefore risky" use of a "slippery" glide wire rather than
"a more standard guide or sensor wire." (Id. at 1-2.)  First,
Dr. Ciccone states, "It is possible, for example, that the glide
wire, or a different or incorrect wire was used which perforated
through the known cyst, injuring both the blood supply to the
kidney and also injur[ing] the spleen, either directly or from
later compression and rupture related to the perinephric
hematoma." (Id. at 3.)  Second, Dr. Ciccone states, "Perhaps the

11

wrong end of a wire was used, which are [sic] often very stiff
and pointy, and which can more easily cause such an injury."
(Id.)  He admits in either case that "this was not recognized or
documented" and that the use of a glide wire itself is not "an
egregious error, but rather a matter of a peculiar surgeon
preference." (Id. at 2-3.)

The Government deposed Dr. Ciccone on July 10, 2015.  Dr.
Ciccone estimated "conservative[ly]" that, as a urological
surgeon, he had performed 500 ureteroscopies, and no patients
had required splenectomies. (Decl. of Elizabeth Tulis Ex. H, at
77:2-16, ECF No. 51-8 [hereinafter Tulis Decl.].)  Dr. Ciccone
had also performed nephrectomies, but kidney cancer or otherwise
improperly functioning kidneys compelled these procedures. (Id.
at 76:17-25.)  Dr. Ciccone characterized the ureteroscopy
procedure as a "minimally invasive surgery" and opined that, if
a patient required a splenectomy and nephrectomy several days
after a ureteroscopy, "those facts in themselves would allow a
reasonable inference" that the doctor negligently performed the
ureteroscopy, because

> [i]t's just so outrageous. . . .  The spleen
> has nothing to do with—very little to do with
> the kidney, so to think an injury can occur to
> an organ that is outside of the urinary tract
> just never—unless you can find another doctor
> who has seen this occur—I can't imagine that
> would be the case—but it's just so out of the
> scope of any accepted outcome of endoscopic
> urologic surgery . . . .

(<u>Id.</u> at 60:8-61:4.)   Accordingly, Dr. Ciccone explained that he reached "the only logical conclusion" that Bosco's perirenal hematoma caused his spleen to rupture. (<u>Id.</u> at 64:2-11.)   While Dr. Ciccone conceded that he could not generally identify causes of splenic subcapsular hematomas because "the spleen is not a urologic organ," (<u>id.</u> at 61::22-25), and "way out of [his] field," (<u>id.</u> at 62:10-11), Dr. Ciccone explained that

> if the urinary tract was fine and the spleen, which is somehow [sic] away from the kidney, had a subcapsular hematoma and I couldn't find any blood around the kidney or any other reason to think that there was a complication from the surgery, then I would attribute the splenic rupture to something nonurologic, but that scenario would be—it's just so improbable.

(<u>Id.</u> at 63:5-13.)   He further dismissed the possibility of spontaneous splenic rupture as

> sort [of] like lightning striking twice at the same time. . . . [b]ecause the patient had a procedure on the left side of his urinary tract, although it's not necessarily right next to the spleen, it's on the left side of the patient.   They then developed a bleeding in the upper left quadrant right after it. It's kind of—it would be kind of a real reach to think somehow at the same time of his ureteroscopy, he miraculously had some splenic rupture for other reasons.

(<u>Id.</u> at 64:12-25.)

Dr. Ciccone addressed the possibility of excessive irrigation, drawing from his experience where he had

13

> seen instances training [his] own residents
> where they have little experience and their
> tendency is to really to pump a lot of water,
> way too much water than you need, and it can
> be very easily overlooked by the attending if
> he is doing something else or if the senior
> resident is involved in something else.

(Id. at 55:7-13.)  Dr. Ciccone admitted, "I can't tell if that happened because that's just not something that's documented—that minutia is not documented in a[n] operative note." (Id. at 55:14-17).

Dr. Ciccone also reiterated that the Government deviated from the standard of care by failing to place a stent after dilating Bosco's ureteral orifice.  Dr. Ciccone explained that, during Bosco's first ureteroscopy,

> the initial attempts to access the ureter was
> [sic] difficult because the ureteral orifice,
> which is the connection between the bladder
> and ureter, was narrow.
> For this reason, the surgeons had to
> dilate the opening in order to pass the scope
> into the kidney.  They then performed the
> ureteroscopy and the nephroscopy, which was
> basically the whole point of the surgery.
> Whenever the ureteral orifice is dilated,
> it's the standard of care to place a stent
> into the kidney and ureter at the end of the
> procedure because it's a very high likelihood,
> almost an inevitability, that there will be an
> obstruction at that point postoperatively.
> In my experience of over ten years in
> urology, I don't think I ever recall a single
> case where me or any of the people I worked
> with in training ever performed a nephroscopy
> without leaving a stent.

(Id. at 13:12-14:7.)   In Dr. Ciccone's opinion, "[t]hat was the most glaring deviation that I think set into motion the chain of events that followed." (Id. at 15:15-16.)   Later, Dr. Ciccone repeated that "it's commonly believed that when you traumatize the upper urinary tract, even if you are dilating a ureteral orifice which is otherwise normal, there is a risk that that kidney will be obstructed after the procedure.   That's widely known.   So, therefore, not leaving a stent would not be protecting the patient against a possible kidney obstruction." (Id. at 32:8-15.)

Again Dr. Ciccone identified two possible scenarios that could have resulted from the failure to place a ureteral stent, (id. at 54:4-12), but this time he ranked them.   He called "most likely" the scenario where the failure to place a stent caused the Government to initially misdiagnose the cause of Bosco's pain as renal colic. (Id. at 56:11-13, 58:12-22.)   Dr. Ciccone could not conclude that in this scenario an earlier diagnosis would have changed Bosco's injuries. (Id. at 58:25-59:15).   Dr. Ciccone relegated to "second most likely"[4] the scenario where the failure

---

[4]   Earlier, Dr. Ciccone described this scenario without qualification:   "So I think that what we can take away is that not leaving a stent caused the retroperitoneal hematoma, may have caused the retroperitoneal hematoma, most likely did, but certainly in my opinion caused at least a delay in diagnosis." (Tulis Decl. Ex. H, at 49:5-10.)   Dr. Ciccone amended this statement on his deposition errata sheet to:   "So I think that what we can take away is that not leaving a stent most likely caused the retroperitoneal hematoma, but certainly in my opinion caused at least a delay in diagnosis." (Id. at 80.)

to place a stent actually ruptured Bosco's cyst. (Id. at 56:14-17.) He also conceded that the cyst could have ruptured under normal pressure. (Id. at 55:22-56:3.)

Regarding possible undocumented error, Dr. Ciccone stated that

> the only other thing that could have possibly happened was somehow an instrument or wire somehow—and, again, this goes back to the pristine nature of the operative record, but could some instrument have gone outside, pierced the urinary tract, gone into the retroperineum and gone all the way up to [spleen] to cause the [spleen] to bleed[? T]hat's a possibility. That would be even more egregious of a technical error if that were to happen. I think that—I certainly never heard of anything remotely like that before.

(Id. at 65:6-17, 80.) He admitted, however, that the Government's choice of a glide wire during the ureteroscopy was not a deviation from the accepted standard of care. (Id. at 14:14-15:9.)

On November 24, 2015, Dr. Ciccone submitted a declaration in support of Bosco's opposition to the Government's motion. (See Plotkin Decl. Ex. K, ECF No. 52-11.) Dr. Ciccone's declaration largely reiterates his opinion expressed in his disclosure and deposition. (See id.) Again Dr. Ciccone opined that due to the Bronx VA's "pristine" records, "it [is] impossible to determine what exactly happened to cause th[e] traumatic result" of Bosco's ureteroscopy, but that based on his "experience and expertise in performing multiple ureteroscopies during the course of [his]

16

career, it is [his] opinion, to a reasonable degree of medical certainty that such a traumatic result, i.e., the emergent nephrectomy and splenectomy one week after the ureteroscopy, would not have occurred in the absence of negligence." (Id. ¶ 4; accord id. ¶ 20.)

Dr. Ciccone's declaration expands on two prior statements. First, he ruled out spontaneous splenic rupture, which he first addressed on cross-examination at his deposition: He states that "to a reasonable degree of medical certainty . . . the spleen did not rupture spontaneously. In my training and experience, I have never encountered a situation where a patient's spleen had to be surgically removed following a diagnostic ureteroscopy due to a spontaneous splenic rupture or for any other reason such as a traumatic injury." (Id. ¶ 19; cf. Tulis Decl. Ex. H, at 64:12-15 ("Q. Did you consider the possibility of spontaneous splenic rupture? A. No. That would be sort [of] like lightning striking twice at the same time.").) Second, Dr. Ciccone identified a fact that he claimed supported undocumented error, which he had not previously referenced: "the operative report describes the spleen as having a laceration." (Id. ¶ 18.) Dr. Ciccone opined that this fact "could easily support the theory that the spleen was lacerated by a wire." (Id.)

### C.  The Instant Motion

On November 2, 2015, the Government moved this Court to exclude certain evidence and to grant partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and summary judgment pursuant to Federal Rule of Civil Procedure 56. The Government argues that Dr. Ciccone's opinion is inadmissible under Federal Rule of Evidence 702 and, as a result, seeks summary judgment because Bosco cannot make out a prima facie claim for medical malpractice.  The Government also argues that summary judgment is appropriate on Bosco's lack of informed consent claim because the only evidence Bosco has placed in the record on informed consent is the opinion of Dr. Ciccone that Bosco was properly informed.  Finally, the Government seeks judgment on the pleadings with regards to Bosco's negligent hiring or negligent supervision claim, because Bosco's allegations are insufficient to state a claim and, alternatively, seeks summary judgment because there is no genuine issue of material fact as Bosco cannot establish the requisite predicate tort.

Bosco timely opposed the Government's motion and seeks to withdraw his lack of informed consent and negligent hiring or supervision claims.  Regarding his medical malpractice claim, Bosco argues that Dr. Ciccone's opinion is admissible and

sufficient to establish medical malpractice through res ipsa loquitur.

### III.  Discussion

Under 28 U.S.C § 2402, the FTCA does not entitle Bosco to a jury trial.  Accordingly, any case law reference to jury herein should be understood to mean trier of fact.

The Government's liability under the FTCA is determined according to the law of the state where the injury occurred. See Zuchowicz v. U.S., 140 F.3d 381, 387 (2d Cir. 1998).  New York law applies here.  A plaintiff asserting a medical malpractice claim in New York must demonstrate (1) that the doctor deviated from acceptable medical practice and (2) that the doctor's deviation was a proximate cause of the plaintiff's injury. James v. Wormuth, 21 N.Y.3d 540, 545 (2013).  While the Federal Rules of Evidence govern the admissibility of expert testimony on an action brought under the FTCA, a plaintiff asserting a medical malpractice claim must meet the substantive requirements of New York law. See Zuchowicz, 140 F.3d at 386, 389.  "It is well established in New York law that 'unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'" Sitts v. United States, 811 F.2d 736, 739 (2d Cir. 1987) (quoting Keane v. Sloan-Kettering Inst.

19

for Cancer Rsch., 96 A.D.2d 505, 506 (2d Dep't 1983)); accord
James, 21 N.Y.3d at 547.

When the actual or specific cause of an accident is
unknown, New York courts permit a trier of fact to infer
negligence merely from the happening of an event and the
defendant's relation to it under res ipsa loquitur. Kambat v.
St. Francis Hosp., 89 N.Y.2d 489, 494 (1997).  "Res ipsa
loquitur is a phrase that, perhaps because it is in Latin, has
taken on its own mystique, although it is nothing more than a
brand of circumstantial evidence." Morejon v. Rais Constr. Co.,
7 N.Y.3d 203, 211 (2006).  Before res ipsa loquitur may apply to
a particular set of facts, the plaintiff must prove by a
preponderance of evidence that three factors exist:  (1) "the
event must be of a kind that ordinarily does not occur in the
absence of someone's negligence;" (2) "it must be caused by an
agency or instrumentality within the exclusive control of the
defendant;" and (3) "it must not have been due to any voluntary
action or contribution on the part of the plaintiff." Kambat, 89
N.Y.2d at 494 (citing Ebanks v. N.Y.C. Transit Auth., 70 N.Y.2d
621, 623 (1987)).

Typically when a res ipsa loquitur instruction is
appropriate, a "jury can reasonably draw upon past experience
common to the community for the conclusion that the adverse
event generally would not occur absent negligent conduct.  In

20

medical malpractice cases, however, the common knowledge and everyday experience of lay jurors may be inadequate to support this inference." Id. at 495 (citations omitted). Therefore, New York courts allow a plaintiff to use expert testimony "to help the jury 'bridge the gap' between its own common knowledge, which does not encompass the specialized knowledge and experience necessary to reach a conclusion that the occurrence would not normally take place in the absence of negligence, and the common knowledge of physicians, which does." States v. Lourdes Hosp., 100 N.Y.2d 208, 212 (2003) (citing Connors v. Univ. Assocs. in Obstetrics & Gynecology, Inc., 4 F.3d 123, 128 (2d Cir. 1993)).

### A. Dr. Ciccone's Opinion Is Admissible Under Federal Rule of Evidence 702

Federal Rule of Evidence 702 permits

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion or otherwise if:

> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

> > (b) the testimony is based on sufficient facts or data;

> > (c) the testimony is the product of reliable principles and methods; and

> (d)  the expert has reliably applied the
> principles and methods to the facts of
> the case.

FED. R. EVID. 702.  The proponent of expert testimony bears the burden of establishing Rule 702's requirements by a preponderance of evidence, see United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007), but "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005).  Indeed, Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), "reinforces the idea that there should be a presumption of admissibility of evidence," Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995), and "[a] review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment.

Rule 702's liberal standard does not require a district court to abdicate its traditional screening function, Nimely, 414 F.3d at 396; Daubert makes clear that under Rule 702, the district court serves as gatekeeper, Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2003), by ensuring (1) the expert is qualified; (2) the expert's opinion is relevant; (3) the expert's opinion is reliable; and (4) the

expert's opinion will assist the trier of fact. <u>Nimely</u>, 414 F.3d
at 396-97 & n.11; <u>Amorgianos</u>, 303 F.3d at 265-66.


### 1.  Qualification

Whether an expert is "qualified as an expert by knowledge,
skill, experience, training, or education," FED. R. EVID. 702, is
a threshold question, "important, among other reasons, because
an 'expert' witness is permitted substantially more leeway than
'lay' witnesses in testifying as to opinions that are not
'rationally based on [his or her] perception,'" <u>Nimely</u>, 414 F.3d
at 396 n.11 (alteration in original) (quoting <u>United States v.
Garcia</u>, 291 F.3d 127, 139 & n.8 (2d Cir. 2002)).  Rule 702's
qualification requirements "must be read in light of the
liberalizing purpose of the Rule." <u>United States v. Brown</u>, 776
F.2d 397, 400 (2d Cir. 1985).  A doctor need not be a specialist
in all areas of medicine implicated by the plaintiff's injury,
see <u>McCullock v. H.B. Fuller Co.</u>, 61 F.3d 1038, 1043 (2d Cir.
1995) (qualifying an otolaryngolist to provide an opinion on a
throat ailment and its causes relating to a claim that gas fume
exposure caused the injury and rejecting the suggestion that the
doctor "had to be a specialist in environmental medicine
. . . [as] an unwarranted expansion of the gatekeeper role
announced in <u>Daubert</u>"), but simply "because a witness qualifies
as an expert with respect to certain matters or areas of

knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields," Nimely, 414 F.3d at 399 n.13.

Dr. Ciccone is a Board-certified urological surgeon and clinical instructor of surgery who has performed several hundred ureteroscopy procedures. Dr. Ciccone bases his opinion on his clinical experience, training, and education. The Court finds that Dr. Ciccone is qualified to offer testimony involving the performance of a ureteroscopy procedure and its expected risks and outcomes.

The Government seeks to disqualify Dr. Ciccone from offering an opinion as to the cause of Bosco's splenic subcapsular hematoma, because he is not a lymphatic system specialist and he admits that "the spleen is not a urologic organ" and the causes of splenic subcapsular hematoma are "way out of his field." (Tulis Decl. Ex. H, at 61:22-25, 62:2-11.) The Government is correct that Dr. Ciccone is not qualified as a lymphatic specialist, but this argument distracts from the matter at issue here: whether a ureteroscopy could cause splenic injury. Dr. Ciccone is trained as a urological surgeon and has performed the procedure several hundred times. Based on his specialized knowledge of the procedure, Dr. Ciccone is qualified to opine whether a ureteroscopy could cause splenic injury, whether in his opinion the record indicates that Bosco's

24

splenic injury resulted from the ureteroscopy, and whether, if the ureteroscopy did cause splenic injury, the splenic injury could have occurred absent negligence. See McCullock, 61 F.3d at 1043.

In his affidavit in support of Bosco's opposition to the Government's motion for summary judgment, Dr. Ciccone expresses the opinion "to a reasonable degree of medical certainty . . . the spleen did not rupture spontaneously. In my training and experience, I have never encountered a situation where a patient's spleen had to be surgically removed following a diagnostic ureteroscopy due to a spontaneous splenic rupture or for any other reason such as a traumatic injury." (Plotkin Decl. ¶ 19.) This statement expands on Dr. Ciccone's assertion, made in response to the Government's cross-examination, that he "would attribute the splenic rupture to something nonurologic" if there were no "blood around the kidney or any other reason to think that there was a complication from the surgery." (Id. at 63:5-13; see also id. 64:12-15 ("Q. Did you consider the possibility of spontaneous splenic rupture?  A. No.  That would be sort [of] like lightning striking twice at the same time.").) "[T]he expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." In re Fosamax Prods. Liab. Litig., 688 F. Supp. 2d

259, 268 (S.D.N.Y. 2009) (quoting Israel v. Spring Indus., No. 98 Civ. 5106, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006)). Dr. Ciccone's opinion regarding spontaneous splenic rupture addresses a specific alternate cause identified by the Government, and he is qualified to offer that opinion because it relates to his opinion that a negligent ureteroscopy caused Bosco's injuries.

The Government contends that the Court should also preclude Dr. Ciccone's opinion that Bosco's spleen did not rupture spontaneously under Federal Rule of Civil Procedure 37, because he first expressed this opinion in an affidavit in support of Bosco's opposition to the Government's motion, after the close of expert discovery in this case. Courts will consider expert affidavits submitted after the close of discovery and in opposition to summary judgment only when the content of the affidavit is within the scope of the initial report. See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (Francis, Mag. J.) ("[T]o the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery."). Dr. Ciccone's opinion that Bosco's spleen did not spontaneously rupture is within the scope of his opinion, expressed in his initial report, that Bosco's injuries would not

occur absent negligence, because it is an obvious alternative cause that Dr. Ciccone must provide a reasonable explanation for dismissing in favor of his opinion that Bosco's injuries would not occur absent negligence. Accordingly, the Court considers this opinion on the present motion and, together with Dr. Ciccone's deposition testimony, Dr. Ciccone's explanation for ruling out spontaneous splenic rupture is reasonable and, therefore, it is admissible. Whether it is credible is a separate determination for the trier of fact to make.

### 2.   Relevance

Rule 401 provides the standard for relevance of an expert's opinion. <u>Amorgianos</u>, 303 F.3d at 265. Thus, an expert's opinion is relevant if "it has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." FED. R. EVID. 401. The Government does not dispute that Dr. Ciccone's opinion is relevant. Dr. Ciccone's opinion is relevant because it makes it more probable that the Government acted negligently during Bosco's ureteroscopy, which is a fact of consequence.

### 3.   Reliability

The reliability inquiry ensures "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert

in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).  This inquiry is flexible, Daubert, 509 U.S. at 594, and "must be tied to the facts of a particular case," Kumho Tire Co., 526 U.S. at 150.  The Second Circuit directs trial courts to consider Rule 702's "indicia of reliability" contained in subparagraphs (b) through (d) and, where appropriate, the nonexhaustive factors that the Supreme Court announced in Daubert:

> (1)  whether a theory or technique "can be (and has been) tested;"
>
> (2)  "whether the theory or technique has been subjected to peer review and publication;"
>
> (3)  a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation;" and
>
> (4)  whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

Amorgianos, 303 F.3d at 265-66 (quoting Daubert, 509 U.S. at 593-94).  In certain cases, "the relevant reliability concerns may focus upon personal knowledge or experience" and "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire Co., 526 U.S. at 150 (alteration in original) (internal quotation marks omitted).  A district court

28

must test reliability at every step by "undertak[ing] a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos, 303 F.3d at 267.

The Government challenges the reliability of Dr. Ciccone's opinion that a ureteroscopy does not result in the injuries Bosco suffered absent negligence as conclusory ipse dixit based on vague assertions about his experience, typical outcomes from the procedure, and Bosco's "unusually negative" results.

Bosco concedes that he offers Dr. Ciccone's opinion not to establish that a specific deviation from the standard of care was a proximate cause of his injuries, but simply to help "bridge the gap" for a trier of fact that it is common knowledge among urologists that injuries requiring a splenectomy and nephrectomy do not occur after a ureteroscopy absent negligence.  To do so, Dr. Ciccone must draw upon the defining characteristics that make him a member of that community:  his training as a urological surgeon, his practical experience performing several hundred ureteroscopies, and his knowledge as a clinical instructor of surgery.  Dr. Ciccone is qualified as an expert in urologic surgery and his testimony regarding the common knowledge of the community of urologic surgeons, based on his training, experience, and knowledge, is reliable.

The Government challenges as speculative the part of Dr. Ciccone's opinion that addresses the Government's use of a glide wire, its failure to place a stent, and its potential excessive irrigation of Bosco's renal pelvis, because he cannot say with reasonable medical certainty whether these actions caused Bosco's injuries. Dr. Ciccone applies his knowledge, experience, and training to the facts of this case to identify specific instrumentalities used (the glide wire) and steps performed (irrigation of the pelvis) or omitted (placement of ureteral stent) during Bosco's procedure where the Government may have acted negligently. Dr. Ciccone's method is the same here as it would be in the examination room and it is, therefore, reliable. See Kumho Tire Co., 526 U.S. at 152; cf. Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999) ("In the actual practice of medicine, physicians do not wait for conclusive, or even published and peer-reviewed studies to make diagnoses to a reasonable degree of medical certainty. . . . [E]xperience with hundreds of patients, discussions with peers, attendance at conferences and seminars, detailed review of a patient's family, personal, and medical histories, and thorough physical examinations are tools of the trade . . . ."), cited with approval in Amorgianos, 303 F.3d at 266-67. The Government's focus on whether Dr. Ciccone's testimony identifies with certainty a specific cause misunderstands the

purpose of Dr. Ciccone's opinion in the context of res ipsa loquitur.

> Experts within a field share a common knowledge about whether a certain type of injury could only occur through negligence, just as average citizens can share a common knowledge about whether barrels of flour normally roll out of warehouse windows. These experts can educate the jurors, essentially training them to be twelve new initiates into a different, higher level of common knowledge. The jurors can then determine for themselves whether the expert opinion is credible, after also considering the defendant's experts' opinions that res ipsa does not apply.

Connors, 4 F.3d at 128 (citing Byrne v. Boadle (1863) 159 Eng. Rep. 299; 2 H. & C. 722). That part of Dr. Ciccone's opinion regarding the glide wire, the failure to place a stent, and the excessive irrigation of Bosco's renal pelvis fulfills this function. Dr. Ciccone's opinion applies his training as a urologic surgeon, his experience performing urologic procedures, and his knowledge as a clinical instructor of surgery in a manner that will help to educate the trier of fact and provide him with the "acumen to be able to determine whether the injury was truly the type that could occur but for the defendant's negligence." Id. at 129.

The Government contends that the Court should preclude under Rule 37 Dr. Ciccone's statement in his affidavit supporting Bosco's opposition to the Government's motion that "[t]he fact that the operative report describes the spleen as having a laceration could

easily support the theory that the spleen was lacerated by a wire,"
because he did not include this fact in his initial Rule 26
disclosure. (See Reply 6 n.4 (quoting Plotkin Decl. Ex. K ¶ 18).)
This statement identifies a fact in the operative report that
supports Dr. Ciccone's opinion in his initial report that some
undocumented error like the glide wire "injur[ing] the
spleen . . . directly" or "the wrong end of a wire [being] used"
could have caused Bosco's injuries. (Plotkin Decl. Ex. F, at 3.)
This is an example of "provid[ing] evidentiary details for an
opinion expressed in his expert report" that is typically permitted
in expert affidavits submitted in connection with dispositive
motions. See Cedar Petrochemicals, Inc., 769 F. Supp. 2d at 279
(quoting Lidle ex rel. Lidle v. Cirrus Design Corp., No. 08 Cv.
1253, 2010 WL 2674584, at *7 n.4 (S.D.N.Y. July 6, 2010)).

### 4. Assisting the Trier of Fact

Finally, under Rule 702, the relevant and reliable opinion
of a qualified expert must "help the trier of fact to understand
the evidence or determine a fact in issue." FED. R. EVID. 702(a);
accord Nimely, 414 F.3d at 397. A court performing this inquiry
should be concerned with two different questions: (1) Does the
expert opinion fit the facts of the case? See Daubert, 509 U.S.
at 591 ("'Expert testimony which does not relate to any issue in
the case is not relevant and, ergo, non-helpful.' The
consideration has been aptly described . . . as one of 'fit.'"

32

(quoting 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 702[02], at 702-18, and United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985))).  And (2) does the expert opinion "'usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it'"? Nimely, 414 F.3d at 397 (quoting United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991)).

As discussed above, Dr. Ciccone's opinion educates the trier of fact so that, if the trier of fact credits his opinion over that of the Government's witnesses, he may decide whether Bosco's injuries could have occurred absent negligence.  Dr. Ciccone's opinion does not substitute his judgment for that of the trier of fact, because "the jury remains free to determine whether its newly-enlarged understanding supports the conclusion it is asked to accept." States, 100 N.Y.2d at 213 (citing Connors, 4 F.3d at 128-29).

### B.  There Is a Genuine Dispute As to Material Fact That Renders Summary Judgment Inappropriate Under Federal Rule of Civil Procedure 56

If a district court determines that a qualified expert's relevant and reliable opinion helps the trier of fact, the opinion is admissible, and the district court is "'bound to consider the evidence in the light most favorable to the plaintiff' when deciding motions for summary judgment."

Amorgianos, 303 F.3d at 268 (quoting In re Joint E. & S. Dist.
Asbestos Litig., 52 F.3d 1124, 1135 (2d Cir. 1995)).

Under Federal Rule of Civil Procedure 56, a court shall
grant summary judgment "if the movant shows that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).
A fact is material if it "might affect the outcome of the suit
under the governing law." Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986).  A genuine dispute exists "where the
evidence is such that a reasonable jury could decide in the non-
movant's favor." Dean v. Univ. at Buffalo Sch. of Med. &
Biomedical Scis., 804 F.3d 178, 186 (2d Cir. 2015)(quoting
Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014)).
In ruling on a motion for summary judgment, "the nonmoving
party's evidence is to be believed, and all justifiable
inferences are to be drawn in that party's favor." Curry v. City
of Syracuse, 316 F.3d 324, 329 (2d Cir. 2003) (quoting Hunt v.
Cromartie, 526 U.S. 541, 552 (1999)).

"The doctrine [of res ipsa loquitur] is generally available
to establish a prima facie case when an unexplained injury in an
area remote from the treatment site occurs while the patient is
anesthetized." Swoboda v. Fontanetta, 131 A.D.3d 1042, 1045 (2d
Dep't 2015) (quoting DiGiacomo v. Cabrini Med. Ctr., 21 A.D.3d
1052, 1054 (2d Dep't 2005)).  "To rely on res ipsa loquitur a

plaintiff need not conclusively eliminate the possibility of all other causes of injury.  It is enough that the evidence supporting the three conditions afford a rational basis for concluding that 'it is more likely than not' that the injury was caused by defendant's negligence." Kambat, 89 N.Y.2d at 495 (citing RESTATEMENT (SECOND) OF TORTS § 328D cmt. e).

There is a genuine dispute as to whether Bosco's injuries would result from a ureteroscopy in the absence of negligence. Because the Court finds Dr. Ciccone's opinion on that fact admissible and, on summary judgment, must consider it in the light most favorable to Bosco, the Court is satisfied that a genuine dispute as to a material fact exists.  The Government does not dispute that Bosco was under general anesthesia during the procedure nor that the Government exercised exclusive control over the agency and instrumentalities involved. Consequently, summary judgment is inappropriate because Bosco has demonstrated that there is a genuine dispute as to whether the Government acted negligently when it performed the ureteroscopy.  Dr. Ciccone's concession that Bosco's cyst could have ruptured absent negligence is not fatal to Bosco's claim because, on the summary judgment record, Dr. Ciccone's opinion affords a rational basis for concluding that it is more likely than not that the Government's negligence caused Bosco's injury.

It is worth emphasizing, of course, that whether Bosco will ultimately be entitled to rely on res ipsa loquitur will depend on the proof adduced at trial.

### C.  Bosco's De Facto Motion to Amend His Complaint Is Granted and His Claims for Lack of Informed Consent and Negligent Hiring and Supervision Are Dismissed with Prejudice

In his opposition to the Government's motion, Bosco "hereby withdraws his claims for lack of informed consent and negligent hiring and supervision." (Opp'n 2.)

District courts in this Circuit have applied both Federal Rule of Civil Procedure 15 (Amended and Supplemental Pleadings) and 41 (Dismissal of Actions) to determine whether a plaintiff can withdraw certain causes of action. Compare Hoolan v. Stewart Manor Country Club, LLC, 887 F. Supp. 2d 485, 495–97 (E.D.N.Y. 2012) (considering the withdrawal of claims under Rule 41), and Pouliot v. Paul Arpin Van Lines, Inc., 235 F.R.D. 537, 540 (D. Conn. 2006) (same), with Fidelity Info. Servs., Inc. v. Debtdomain GLMS PTE Ltd., No. 09 Civ. 7589 (LAK)(KNF), 2010 WL 1133882, at *1 (S.D.N.Y. Mar. 25, 2010) (considering withdrawal of claims under Rule 15), and Roberts v. Cooperatieve Centrale Raiffeisen-Boeren Leenbank B.A., No. 09 Civ. 5271 (JGK), 2010 WL 23170, at *1 (S.D.N.Y. Jan 5, 2010) (same).  While withdrawal of some claims as opposed to an entire action appears to be best considered under Rule 15, the distinction is academic because the same standard applies under either rule. See Smith v. Artus,

522 F. App'x 82, 84 n.2 (2d Cir. 2013) (citing <u>Wakefield v. N. Telecom, Inc.</u>, 769 F.2d 109, 114 n.4 (2d Cir. 1985) ("[I]t is clear that a district court may permit withdrawal of a claim under Rule 15 subject to the same standard of review as a withdrawal under Rule 41." (citations omitted))).

Rule 15 instructs courts that leave to amend "should be freely give[n] . . . when justice so requires." FED. R. CIV. P. 15(a)(2). Undue delay by the movant, bad faith, undue prejudice to the opposing party, and the futility of the amendment are among the reasons to deny leave to amend. <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).[5] Additionally, a court may convert a motion for dismissal without prejudice to a motion for dismissal with prejudice. <u>See</u> <u>Gravatt v. Columbia Univ.</u>, 845 F.2d 54, 55-56 (2d Cir. 1988). If the court decides that dismissal with prejudice is more appropriate, however, "fundamental fairness requires [the court] to afford the plaintiff an opportunity to withdraw his motion and proceed with the litigation." <u>Id.</u> at 56.

---

[5] Under Rule 41, "[f]actors relevant to the consideration of a motion to dismiss without prejudice include [1] the plaintiff's diligence in bringing the motion; [2] any 'undue vexatiousness' on plaintiff's part; [3] the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; [4] the duplicative expense of relitigation; and [5] the adequacy of plaintiff's explanation for the need to dismiss." <u>Zagano v. Fordham Univ.</u>, 900 F.2d 12, 14 (2d Cir. 1990).

The Court construes Bosco's statement as a request for leave to amend his complaint to withdraw the claims under Rule 15(a)(2).  The Government raises no objection to Bosco's withdrawal of these claims. (See generally Reply.)  Because a court should give leave freely when justice so requires and because there is no evidence of undue delay or bad faith by Bosco or undue prejudice to the Government, Bosco's motion to amend his complaint to withdraw his claims for lack of informed consent and negligent hiring and supervision is granted.

The Court also exercises its discretion to dismiss Bosco's claims for lack of informed consent and negligent hiring and supervision with prejudice. See Gravatt, 845 F.2d at 56.  By seeking to withdraw these claims in opposition to summary judgment, Bosco has evinced his judgment that he cannot prove the claims. See Wakefield, 769 F.2d at 114-15; see also Pac. Elec. Wire & Cable Co. v. Set Top Int'l, Inc., No. 03 Civ. 9623 (JFK), 2005 WL 578916, at *7-8 (S.D.N.Y. Mar. 11, 2005) (identifying the common thread between "conversion" cases like Wakefield, 769 F.2d 109, Zagano, 900 F.2d 12, Deere & Co. v. MTD Holdings Inc., No. 00 Civ. 5936 (LMM), 2004 WL 1432554 (S.D.N.Y. June 24, 2004), and Jewelers Vigilance Comm., Inc. v. Vitale Inc., No. 90 Civ. 1476 (MJL), 1997 WL 582823 (S.D.N.Y. Sept. 19, 1997), to be "that the plaintiff was unwilling, or unable, to submit the claims at issue to the factfinder").

38

As fundamental fairness requires, Bosco may withdraw his motion to amend the complaint by notifying the Court and the Government of his intention to do so no later than 60 days from the date of this Opinion & Order.  If Bosco withdraws the motion to amend, the Government may renew its motion with regards to Bosco's claims for lack of informed consent and negligent hiring and supervision.

## Conclusion

The Government's motion to exclude the opinion of Dr. Ciccone is denied.  The Government's motion for summary judgment on Bosco's claim for medical malpractice is denied.  Bosco's de facto motion to amend his complaint to withdraw his claims for lack of informed consent and negligent hiring and supervision is granted and those claims are dismissed with prejudice.  Out of fundamental fairness to Bosco, he shall notify the Court and the Government within 60 days of the date of this Opinion & Order if he intends to withdraw his motion to amend his complaint. Accordingly, the Government's motion for partial judgment on the pleadings and summary judgment on Bosco's lack of informed consent and negligent hiring and supervision claims is denied as moot.  If Bosco withdraws his motion to amend, however, the Government shall be permitted to renew its motion with regards to those claims.

A final pretrial conference is scheduled for Tuesday, October 25, 2016, at 11:00 a.m. in Courtroom 20C, at which time a firm trial date will be set for a time shortly following the conference.

**SO ORDERED.**

Dated:     New York, New York
           September 26, 2016

                                        John F. Keenan
                              United States District Judge

40